# UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF TENNESSEE
# WESTERN DIVISION

STINSON'S INDUSTRIAL
MAINTENANCE, INC.,

   Plaintiff,

v.

PMC GROUP N.A., INC.,
JOHN FAVRE, JR.,

   Defendants.

Case No. 2:22-cv-2253-MSN-tmp

## ORDER DENYING EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Before the Court is Plaintiff Stinson's Industrial Maintenance, Inc.'s ("Plaintiff") Emergency Motion for Temporary Restraining Order and Preliminary Injunction, docketed April 21, 2022. ("Motion") (ECF No. 2.) The Court held an emergency hearing on April 26, 2022 to address the Motion, whereupon the Court heard oral argument, orally granted expedited discovery, requested additional briefing, and took the matter under advisement pending submission of the parties' supplemental briefs. (*See* ECF No. 15.) Plaintiff filed a Supplemental Memorandum in Support of its Motion and Defendant PMC Group N.A., Inc. ("PMC Group N.A." or "Defendant") filed its Response in Opposition, both on April 29, 2022.[1] (ECF Nos. 17, 18.) For the following reasons, Plaintiff's Motion is **DENIED**.

---

[1] For purposes of this Order, "Defendant" refers only to Defendant PMC Group N.A. because counsel for Defendant John Favre, Jr. ("Defendant Favre") filed his Notice of Appearance on May 11, 2022, (ECF No. 23), and has not yet had an opportunity to file a response to the Motion.

## BACKGROUND

Plaintiff, a Tennessee corporation, "provides industrial maintenance services to clients in Memphis and northern Mississippi." (ECF No. 2-1 at PageID 38.) Defendant, a Delaware corporation, provides many of the same services through one of its legal subsidiaries, PMC Biogenix Inc. ("PMC Biogenix"), a Tennessee corporation, and had been one of Plaintiff's clients before Plaintiff effectively discontinued their relationship on November 3, 2021.[2] (ECF No. 1-6 at PageID 28.) Defendant vigorously contends that the proper defendant in this matter should have been nonparty PMC Biogenix, not PMC Group N.A., because it is the separate legal entity with which Plaintiff had a business relationship. (ECF No. 18 at PageID 114.)

Notwithstanding such protestations, Plaintiff has sued Defendant PMC Group N.A. for breach of contract arising from an alleged decision to hire John Favre, Jr., through nonparty Aerotek, Inc. ("Aerotek"), in violation of his Agreement Not to Compete ("Noncompete Agreement"). (ECF No. 1 at PageID 2–4.) Specifically, Plaintiff identifies this hiring decision as just one among many similar abuses by Defendant, which has allegedly engaged in an ongoing employee-poaching "campaign" that threatens to irreparably harm Plaintiff's operations. (ECF No. 2-1 at PageID 39.) Defendant denies these allegations, contending instead that Plaintiff's voluntary decision to terminate its relationship with PMC Biogenix on November 3, 2021 released Defendant Farve from the Noncompete Agreement as to PMC Biogenix because Plaintiff no longer "conducts business" with it. (ECF No. 18 at PageID 115; ECF No. 1-4 at PageID 20.) Consequently, according to Defendant, Defendant Favre clearly did not breach his Noncompete Agreement when he resigned his employment with Plaintiff on February 24, 2022 and assumed employment with Aerotek, which may have assigned him to work at PMC Biogenix. (*See* ECF

---

[2] Plaintiff indicates in its Supplemental Brief that it terminated its services to PMC Biogenix "at least temporarily." (ECF No. 17 at PageID 105; ECF No. 1-6 at PageID 27)

No. 1 at PageID 3; ECF No. 18 at PageID 125.)

Plaintiff responds that it decided to cut ties with PMC Biogenix under duress because Defendant — the alleged parent entity of PMC Biogenix — has (a) attempted to poach Plaintiff's employees and (b) unreasonably asks the Court to read Plaintiff's Noncompete Agreement in an "overly technical" manner that offends "the spirit of" the document. (ECF No. 17 at PageID 106.) Defendant counters that PMC Biogenix had an independent basis to end its relationship with Plaintiff, citing "performance issues" with Plaintiff's workers assigned to work at PMC Biogenix. (ECF No. 116–17.) It further contends that "no offers of direct employment with PMC Biogenix have been made to Mr. Favre and there are no plans to do so. Further, PMC Biogenix has no plans to make any offers of employment with PMC Biogenix to any of the industrial maintenance contractors of Plaintiff or of any other contractor used on site. (*Id.*; ECF No. 18-1 at PageID 135.) Plaintiff filed the instant opposed Motion for a temporary restraining order ("TRO") or preliminary injunctive relief to enjoin Defendant (and, specifically, its subsidiary PMC Biogenix) from allegedly poaching its employees. (ECF No. 2.)

## **LEGAL STANDARD**

"A temporary restraining order . . . , like a preliminary injunction, 'is an extraordinary remedy reserved only for cases where it is necessary to preserve the status quo until trial.'" *Detroit Will Breathe v. City of Detroit*, 484 F. Supp. 3d 511, 515–16 (E.D. Mich. 2020) (citing *Enchant Christmas Light Maze & Mkt. Ltd. v. Glowco, LLC*, 958 F.3d 532, 535 (6th Cir. 2020); *S. Glazer's Distributors of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017). A TRO may be issued without notice under Fed. R. Civ. P. 65(b)(1) only when: (1) "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition"; and (2) the

3

plaintiffs' "attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." *Detroit Will Breathe*, 484 F. Supp. 3d at 515.

Like a preliminary injunction, a TRO "is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (citing *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000). Courts consider four factors to determine whether such injunctive relief should be issued: (1) whether the movant has shown a strong likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction. *Id*. at 573. Notably, these are "factors to be balanced, not prerequisites that must be met," which means the weight assigned to one factor "may depend on the strength of the other factors." *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985); *see Coal. to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 244 (6th Cir. 2006) ("All four factors are not prerequisites but are interconnected considerations that must be balanced together.") "When one factor is dispositive, a district court need not consider the others." *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019). The movant carries the burden of persuasion, and the proof required to obtain a preliminary injunction exceeds that required to survive a summary judgment motion. *Leary*, 228 F.3d at 739 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990)); *Detroit Will Breathe*, 484 F. Supp. 3d at 515–16.

## **DISCUSSION**

Plaintiff argues that the Court should issue a TRO on its breach of contract and tortious interference claims because both claims succeed after a balance of the factors sketched above. (ECF No. 2-1 at PageID 41.) Defendant responds that "Plaintiff has sued the wrong PMC entity

and, further, has failed to name an indispensable party . . . ." (ECF No. 18 at PageID 117.) Defendant also avers that Plaintiff's two claims fail under the balance of factors. (*Id.* at PageID 121–31.) The Court assesses these arguments in turn under each factor.

### A. Whether Plaintiff Has a Strong Likelihood of Success on the Merits

#### 1. Applicable Law

"In order to establish a likelihood of success on the merits of a claim, a plaintiff must show more than a mere possibility of success." *Six Clinics Holding Corp., II v. Cafcomp Sys.*, 119 F.3d 393, 402 (6th Cir. 1997); *see Mason County Med. Ass'n v. Knebel*, 563 F.2d 256, 261 n.4 (6th Cir. 1977). "[T]he Sixth Circuit permits a district court, in its discretion, to grant a preliminary injunction or temporary restraining order 'even where the plaintiff fails to show a strong or substantial probability of ultimate success on the merits of his claim, but where he at least shows *serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant* if an injunction is issued." *Ever-Seal, Inc. v. Halferty*, No. 3:22-cv-00082, 2022 WL 418692, at *10–11 (M.D. Tenn. 2022) (quoting *Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982) (emphasis added). Nevertheless, "the movant is always required to demonstrate more than the mere 'possibility' of success on the merits," *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991) (quoting *Knebel*, 563 F.2d at 261 n. 4), and a district court must make "*specific* findings of irreparable injury[.]" *Halferty*, 2022 WL 418692, at *11–12 (quoting *Friendship Materials*, 679 F.2d at 105) (emphasis added).

#### 2. Breach of Contract and Tortious Interference Claims

Courts in Tennessee have clearly articulated the elements required to state a claim for breach of contract under state law. "To establish a [claim for] breach of contract, a plaintiff must

5

show (1) the existence of an enforceable contract, (2) non-performance amounting to a breach of the contract, and (3) damages caused by the breached contract." *Great Am. Opportunities, Inc. v. Cherry Bros., LLC*, No. 3:17-CV-01022, 2019 WL 632670, at *8 (M.D. Tenn. 2019); *Bridgestone Am.'s Inc. v. Int'l Bus. Machines Corp.*, 172 F. Supp. 3d 1007, 1019 (M.D. Tenn. 2016); *see Halferty*, 2022 WL 418692, at *12.

To prevail on a tortious interference claim, a plaintiff must show the following elements: "(1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and finally, (5) damages resulting from the tortious interference." *Moore-Pennoyer v. State*, 515 S.W.3d 271 (Tenn. 2017) (quoting *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002)).

***Turning first to the breach of contract claim***, Plaintiff asserts that Defendant breached the Noncompete Agreement by hiring, and continuing to employ, Defendant Favre. (ECF No. 2-1 at PageID 42.) It also argues that the Noncompete Agreement safeguards protectable business interests, which concern: (a) "customer relationships and related information"; (b) "employment and client relationships"; and (c) opportunistic disintermediation.[3] (ECF No. 2-1 at PageID 43–44.) Finally, Plaintiff maintains that the Noncompete Agreement is reasonable in scope under Tennessee law and that Defendant Favre "continues to be in breach" of that Agreement "to this day," all of which demonstrates a high likelihood of success on the merits. (*Id.* at PageID 48–50.)

---

[3] Opportunistic disintermediation has been defined by Tennessee courts as "either the improper elimination of the staffing agency as the 'middle man' or the appropriation of the staffing agency's services without proper compensation." *Columbus Med. Servs., LLC v. David Thomas & Liberty Healthcare Corp.*, 308 S.W.3d 368, 386 (Tenn. Ct. App. 2009).

6

Defendant responds with an Affidavit from Davorise Allen ("Mr. Allen"), Maintenance and Facility Manager for PMC Biogenix, that explains to the extent Plaintiff had a servicer relationship with a PMC entity before November 3, 2021, it worked with PMC Biogenix and *not* PMC Group N.A. (ECF No. 18-1 at PageID 134–36.) Mr. Allen further submits that he did not offer to employ Defendant Favre at PMC Biogenix, does not intend to extend one, and is unaware of any PMC Biogenix employee who has made such an offer. (*Id.* at PageID 135.) Additionally, Defendant argues that Plaintiff's breach of contract claim cannot succeed on the merits because "the unambiguous language of the noncompete agreement demonstrates that it does not apply," and Plaintiff has not actively conducted business with PMC Biogenix since before November 3, 2021. (ECF No. 18 at PageID 121, 123.) Next, Defendant avers that Plaintiff does not have a legitimate protectable business interest because Defendant Favre received *general* — rather than *unique* — occupational training from Plaintiff and was hired as a "*lead* industrial maintenance technician," which implies he had a reservoir of knowledge before Plaintiff began to train him. (*Id.* at PageID 127.) Finally, Defendant maintains that Plaintiff did not suffer opportunistic disintermediation because there has "been no appropriation of Plaintiff's services without proper compensation" since "none of Plaintiff's employees have left Plaintiff to work for PMC Biogenix." (*Id.* at PageID 129.)

Here, and initially, Plaintiff has not proved that it sued the correct PMC entity. *Leary*, 228 F.3d at 739 (burden on the movant to show why it is entitled to injunctive relief.) Although Plaintiff submits in its Verified Complaint that PMC Biogenix is a "wholly owned subsidiary" of the named Defendant, PMC Group N.A., the record is at best unclear as to this relationship.[4] (ECF

---

[4] Plaintiff mentions that it "originally sent its cease and desist letters to PMC Biogenix, Inc. The only response Stinson's received to those letters was from in-house counsel at PMC Group, N.A." (ECF No. 17 at PageID 110.) Accordingly, the Court surmises, Plaintiff acted on its good-faith assumption that PMC Biogenix is a legal subsidiary of PMC Group N.A.; indeed,

7

No. 1 at PageID 2; ECF No. 17 at PageID 110.) In fact, the documents suggest the opposite conclusion because: (a) all invoices were billed to PMC Biogenix without mentioning PMC Group N.A., (ECF No. 1-7); (b) Plaintiff's email correspondence from Mr. Matthew Moore ("Mr. Moore") discusses "Stinson Industrial's perspective on our relationship with PMC Biogenix," also without mentioning PMC Group N.A., (ECF No. 1-6 at PageID 27); (c) Mr. Moore texted Mr. Allen, who confirmed via affidavit that he is "not an employee of PMC Group N.A. [and lacks] authority to bind PMC Group, N.A. in any way," (ECF No. 18-1 at PageID 133), to discontinue Plaintiff's relationship with PMC Biogenix[5]; and, of less significance than the foregoing, (d) PMC Biogenix has a Memphis, Tennessee business address, (ECF No. 1-7 at PageID 30), distinguishable from the Mt. Laurel, New Jersey address Plaintiff assigns to PMC Group N.A.

---

Plaintiff sued PMC Group, N.A. "based upon" this information. (*Id.*) While the Court recognizes that allegations presented in a Verified Complaint deserve equal weight to assertions in an affidavit under Fed. R. Civ. P. 65(b), here, and contrary to the Verified Complaint, Mr. Allen's affidavit pointedly disputes that PMC Group, N.A. influences hiring decisions at PMC Biogenix. (ECF No. 18-1 at PageID 134.) Consequently, the Court does not accept either assertion at face value and looks elsewhere in the record to discern information that corroborates one portrayal over the other. Upon review, the Court notes that Plaintiff did not file the letters and responses referenced in the Verified Complaint as exhibits; thus, the Court cannot independently validate Plaintiff's position that PMC Group N.A. is actually "directing Aerotek to hire Stinson's employees" and reassigning them to PMC Biogenix. (ECF No. 17 at PageID 109.) Without access to the "information known to Stinson's at the time of filing the Verified Complaint and Emergency Motion," the Court is unclear on the ***specific*** facts that underlie Plaintiff's Verified Complaint, as required by Rule 65(b). (*Id.* at PageID 110.) Plaintiff bears the burden to show why it is entitled to injunctive relief — an extraordinary remedy. *See Detroit Will Breathe*, 484 F. Supp. 3d at 515; *Overstreet*, 305 F.3d at 573. Therefore, whether PMC Group N.A. and PMC Biogenix are in fact "substantively legally related" for purposes of personal jurisdiction remains unclear at this juncture and the Court will not draw conclusions based on correspondences it has not reviewed. *See Hardaway v, Quince Nursing & Rehab. Ctr., LLC*, No. 2:19-cv-2464, 2020 WL 4106440, at *7 (W.D. Tenn. July 2020), *reconsideration denied*, 2020 WL 4507327 (W.D. Tenn. Aug. 2020).

[5] If PMC Group N.A. truly controls PMC Biogenix, and Plaintiff's relationship was — as alleged — with PMC Group N.A., the Court finds it at least *peculiar* that Mr. Moore contacted Mr. Allen (twice) when Mr. Allen lacks *any* authority to bind PMC Group N.A. and all invoices billed by Plaintiff were paid in full by PMC Biogenix. (*See* ECF No. 18-1 at PageID 133.)

(ECF No. 1 at PageID 1.) These facts taken together, combined with Mr. Allen's affidavit denying any affiliation with PMC Group N.A., undermine Plaintiff's yet uncorroborated *assumption* that PMC Group N.A. directs employment practices at PMC Biogenix.[6] Therefore, the Court concludes that Plaintiff has not shown a likelihood of success on the merits against the *named Defendant* PMC Group N.A. sufficient to warrant a TRO as to its breach of contract claim.[7]

However, even if the Court could be certain that Plaintiff sued the proper PMC entity, Plaintiff's breach of contract claim does not have a high likelihood of success on the merits. Initially, the plain language of the Noncompete Agreement provides that Defendant Farve "shall not . . . accept employment from another business that is in any manner similar to, or in competition with, Stinson's . . . and which operates in a facility in which Stinson's *already*

---

[6] Defendant's position is, as it has always been, that "PMC Group has **no** relationship with Plaintiff." (ECF No. 18 at PageID 114) (emphasis in original). Plaintiff argues that "Stinson's has a basis to believe that PMC is actually directing Aerotek to hire Stinson's employees and assign them to Stinson's." (ECF No. 17 at PageID 109.) This statement is "based on numerous conversations Stinson's representatives had with PMC representatives where PMC representatives were entirely dismissive of Stinson's concerns of PMC's poaching . . . ." (*Id.*) However, whether Plaintiff here refers to PMC Biogenix or PMC Group N.A. as "PMC" remains unclear from the supplemental brief, (*id.*); moreover, the context for the conversations, the identities of these representatives, their positions at PMC and Stinson's — let alone sworn affidavits by them — have not been tendered by Plaintiff. While the Court notes that Plaintiff need only present "serious questions going to the merits" at this stage, it cannot ignore ambiguities that render what any such questions could be asking indeterminable. *Halferty*, 2022 WL 418692, at *11–12. For example, the Court cannot determine with any certainty from the pleadings *which* PMC entity — the Defendant or a nonparty — Plaintiff refers to as "PMC" in its brief because PMC Biogenix is listed on all invoices and correspondences but PMC Group N.A. is the named Defendant.

[7] The parties also dispute whether Plaintiff neglected to join Aerotek as an indispensable party. (ECF No. 18 at PageID 119–20; ECF No. 17 at PageID 109–110.) Plaintiff attempts to walk a fine line because the Verified Complaint submits its employees have been "approached by PMC's staffing agency for placement at PMC," (ECF No. 1 at PageID 5), and Mr. Moore identifies this agency as Aerotek in his email. (ECF No. 1-6 at PageID 27.) Defendant argues that this information indicates *Aerotek* employs Defendant Favre and that an injunction against PMC Group N.A. would therefore not enjoin any breach of the Noncompete Agreement. (ECF No. 18 at PageID 119–20.)

9

*conducts* business for a period of one (1) year."[8] (ECF No. 1-4 at PageID 20) (emphasis added). As Defendant aptly points out, this *present*-tense language reappears in the subsequent paragraph: ". . . the Employee shall be regarded as engaging in a 'business in any manner similar to or in competition with Stinson's if . . . [he] engages in any functions typically involved in facility maintenance . . . within a facility in which Stinson's *already conducts* business."[9] (*Id.*) In Tennessee, where "the contractual language is clear and unambiguous, *the literal meaning controls*; however, if the words are ambiguous, *i.e.*, susceptible to more than one reasonable interpretation, the parties' intent cannot be determined by a literal interpretation of the language." *Allmand v. Pavletic*, 292 S.W.3d 618, 630 (Tenn. 2009) (citing *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006)) (emphasis added).

Here, the Noncompete Agreement has been drafted in present tense to preclude Plaintiff's employees from accepting employment with entities that presently conduct business with Plaintiff. The Court adopts this reading, as proffered by Defendant, for two reasons. *First*, to construe this language as preventing Plaintiff's employees from engaging in facilities maintenance for businesses where Plaintiff does not presently conduct business expands the scope of the provision beyond reasonable limits. Whereas interpreting the clause by its plain meaning to include only those enterprises already conducting business with Plaintiff limits the clause to contemplate certain

---

[8] The Court accepts Plaintiff's legal assertion that Tennessee courts have found one-year noncompetition timeframes reasonable. *See Dearborn v. Chem. Co. v. Rhodes*, 1985 Tenn. App. LEXIS 2809, at *7 (Tenn. Ct. App. 1985) ("The time limitation as we construe it is one year and this limitation appears reasonable under the circumstances."); *Crain v. Kesterson Food Co.*, No. 02A01-9302-CH-00041, 1994 Tenn. App. LEXIS 65 (Tenn. Ct. App. 1994).

[9] The repetition of this phrase militates in favor of reading the contract narrowly because, under Tennessee law, "courts must construe all contractual terms harmoniously" and each "individual provision 'must be interpreted in the context of the entire contract.'" *Beijing Fito Med. Co. v. Wright Med. Tech., Inc.*, 763 F. App'x 388, 392 (6th Cir. 2019) (quoting *D&E Constr. Co., Inc. v. Robert J. Denley Co.*, 38 S.W.3d 513, 518–19 (Tenn. 2001).

ascertainable facilities, a broader interpretation would expand its scope to include an indefinite number of maintenance companies that are *not* presently conducting business with Plaintiff. Put differently, such a sweeping interpretation renders the geographic scope of the clause unknown despite that, "[t]o be enforceable, the restriction must not be overly broad in its territorial scope . . . ." *Baker v. Hooper*, No. 03A01-9707-CV-00280, 1998 WL 608285, at *15 (Tenn. Ct. App. 1998); *Dabora, Inc. v. Kline*, 884 S.W.2d 475, 478 (Tenn. Ct. App. 1994). Thus, anything *broader* than what Plaintiff repeatedly describes as an "overly technical" interpretation of the Noncompete Agreement would extend the provision's territorial scope to an *unascertainable number* of entities — a sphere *far* "greater than necessary to protect the business interest of the employer."[10] *Murfreesboro Med. Clinic, P.A. v. Udom*, 166 S.W.3d 674, 678 (Tenn. 2005) (citing *Allright Auto Parts v. Berry*, 409 S.W.2d 361, 363 (Tenn. 1966)); (ECF No. 17 at PageID 106.)

The *second* reason the Court prefers to read the Noncompete Agreement narrowly relates to Plaintiff's proposed reading of the same.[11] Plaintiff argues that its decision to cut ties with

---

[10] That "Stinson's offered to assist Favre with finding employment at *a plant other than PMC*, so that he would not violate his Noncompete Agreement" introduces a fresh wrinkle to the interpretive analysis because it presumes new employment at *certain* maintenance plants falls outside the scope of the Agreement whereas new employment at *PMC* falls within it. (ECF No. 1 at PageID 5.) However, the Court cannot discern from the clause at issue any limitation besides the one that prohibits an employee from accepting employment at a "facility in which Stinson's already conducts business" within one-year after departure from Stinson's. (ECF No. 1-4 at PageID 20.) Should the Court reject this limitation as "overly technical," as Plaintiff requests, without a *clear* alternative, it would risk endorsing a noncompete provision with "overbroad" territorial limits not limited to a specific and well-defined group of persons or entities. *Hooper*, 1998 WL 608285, at *15; (ECF No. 17 at PageID 106.) Absent greater specificity, and mindful that, "[i]n Tennessee, one of the *most significant factors* to be considered when determining the reasonableness of a covenant not to compete is 'whether the territorial limitations in the covenant are reasonable,'" the Court cannot accept Plaintiff's argument. *J.T. Shannon Lumber Co. v. Barrett*, No. 2:07-cv-2847-JPM-cgc, 2010 WL 3069818, at *30 (W.D. Tenn. 2010) (quoting *Columbus Med. Servs*, 308 S.W.3d 368 at 383–84 (emphasis added).

[11] Plaintiff's citation to the Tennessee Supreme Court's decision in *Columbus Med. Servs.* for the proposition that a noncompete agreement may be enforceable despite defendants' inability to harm the plaintiff any longer misses the mark for several reasons. 308 S.W.3d 368. *First*, the

11

"PMC"[12] on November 3, 2021 was made under duress "because of PMC's efforts to poach Stinson's employees . . ." and "[t]o read the Noncompete Agreement otherwise would allow PMC . . . to knowingly violate the spirit of Stinson's Noncompete Agreement with its employees by severing ties and raiding their employees the very next day." (ECF No. 17 at PageID 105–07.) However, assuming for the moment that this statement is true, nothing prevented Plaintiff from seeking a TRO before or immediately after it was allegedly "induce[d]" to suspend its relationship with PMC Biogenix on November 3, 2021. (*Id.*) Instead, Plaintiff waited until April 21, 2022 — in effect, allowing the alleged poaching to continue for nearly *six months* — to seek emergency relief for an alleged violation of the "spirit" of its Noncompete Agreement after Defendant Favre quit in February 2022. (*Id.*) *Tu quoque* aside,[13] Plaintiff has not offered any concrete alternative

---

portion of the decision cited addresses whether the plaintiff had a protectable business interest under a noncompete agreement, but here the Court is deciding a threshold question: whether the Noncompete Agreement extends to companies with which Plaintiff no longer "conducts" business. *Second*, the specific language of the Noncompete Agreement at issue here — Defendant Favre "shall not engage in . . . employment with another business that . . . operates in a facility in which Stinson's already conducts business," (ECF No. 1-4 at PageID 20) — varies in tense and scope from the agreement in *Columbus Med. Servs.*, which provided *only* that the "employee shall not directly or indirectly solicit business from, or agree to provide services to facility." 308 S.W.3d at 373. In sum, *Columbus Med. Servs.* is inapposite because the immediate issue is not whether Plaintiff has a protectable business interest under its Noncompete Agreement, but whether the Noncompete Agreement *applied* to the *named* Defendant at all *at the time* of the alleged breach.

[12] Based on Mr. Moore's email and text message, the Court understands "PMC" in this context to mean PMC Biogenix. (ECF No. 1-6.)

[13] Rather than directly address Defendant's argument about the repeated present tense language ("already conducts") in the Noncompete Agreement, (ECF No. 1-4 at PageID 20), Plaintiff attempts to divert the Court's attention away from the interpretive question before it and towards the alleged misconduct that presumably forced it to cut ties with PMC Biogenix. (ECF No. 17 at PageID 107.) Plaintiff maintains that Defendant's alleged misconduct, coupled with a textual reading of the Noncompete Agreement, offends the spirit of the document. (*Id.*) But the Court may adjudicate only cases and controversies in law. To pontificate about or, worse, draw legal conclusions that favor, a contract provision's "spirit" *at the expense of its uncontested written language* would constitute a yet groundbreaking nadir in judicial activism. *Beijing Fito*, 763 F. App'x at 394 (quoting *Lamar Advert. Co. v. By-Pass Partners*, 313 S.W.3d 779, 791 (Tenn. Ct. App. 2009)) ("When interpreting the contract, the court must 'look to the language of the

12

interpretation of the Noncompete Agreement's plain language for the Court to compare to Defendant's position.[14] Therefore, the Court adopts Defendant's interpretation of the clause at issue, rendering any argument by Plaintiff that Defendant or PMC Biogenix breached the Noncompete Agreement unlikely to succeed on the merits because Plaintiff and PMC Biogenix were not conducting business when Mr. Favre allegedly accepted employment with Defendant.[15]

**Turning to the tortious interference claim**, the *first element* strongly suggests Plaintiff has a low chance of success on the merits. This conclusion is appropriate for two reasons. First, the foregoing analysis precludes the Court from finding "an *existing* business relationship" between Plaintiff and Defendant PMC Group N.A., as opposed to PMC Biogenix as suggested by Plaintiff's docketed invoices. *Trau-Med of Am., Inc.*, 71 S.W.3d at 701. (*See* ECF No. 1-7.) Second, even if such a relationship *did* at some point exist, nothing suggests that PMC Biogenix, assuming for

---

instrument and to the intention of the parties, and impose a construction which is fair and reasonable.'")

[14] Notably, Mr. Allen denies that he or anyone he knows at PMC Biogenix offered Defendant Favre a job with that entity. (ECF No. 18-1 at PageID 135.) Plaintiff has merely alleged in its Verified Complaint that Defendant Favre accepted employment with a PMC entity but has not provided an affidavit from anyone familiar with such employment to corroborate the same — which would be helpful here, notwithstanding the verified nature of the complaint, because Mr. Allen's affidavit pointedly contradicts Plaintiff's assertion. Moreover, Plaintiff has the burden to show that the specific "words" cited by Defendant in the Noncompete Agreement at issue are "susceptible to more than one reasonable interpretation." *Allmand*, 292 S.W.3d at 630. Here, no alternative reading has been argued.

[15] The Court need not explore whether Plaintiff has a protectable business interest under the Noncompete Agreement because it has found Plaintiff unlikely to succeed on the merits that the Agreement applied at the time of the alleged breach in February 2022. Since the "*literal meaning*" of the Noncompete Agreement's terms reveals that it is unlikely that the Agreement was in effect at the time Defendant Favre allegedly violated it, the nature of any business interests protected thereunder is immaterial to the success of the claim. *Allmand*, 292 S.W.3d at 630 (emphasis added). Put differently, Plaintiff's chance of success on the merits does not increase with protectable business interests under the Noncompete Agreement when it is unlikely that the Agreement was *operative* at the time the alleged breach occurred.

the moment that it is a legally cognizable subsidiary of PMC Group N.A., was "a facility with which Stinson's already *conducts* business"[16] after November 3, 2021 when Plaintiff cut ties with PMC Biogenix. (ECF No. 1-4 at PageID 20; ECF No. 1-6 at PageID 27–28.) (emphasis added.) Therefore, the first element does not favor Plaintiff's chances of success on the merits of this claim.

The remaining factors do not counteract the conclusion reached on the first one because nothing suggests that named Defendant *PMC Group N.A.* "intended to cause the breach or termination of the business relationship" by "improper motive or improper means" when it allegedly hired Plaintiff's employees after Plaintiff severed its relationship with *PMC Biogenix*. *Trau-Med of Am., Inc.*, 71 S.W.3d at 701. Still, Plaintiff submits that it is likely to succeed on its tortious interference claim because "at least four other employees of Stinson's, including but not limited to, Jarvis Smith, Anthony "Buddy" Aswell, Ospicio Linares, and Hugo Abundis, have been approached by PMC and/or PMC's staffing agency to resign their employment with Stinson's and accept placement at PMC." (ECF No. 2-1 at PageID 51.) However, this argument falls short for a few reasons. Initially, and as previously discussed, the documents in the record indicate that if these individuals were approached by a PMC entity at all, that entity was PMC Biogenix or Aerotek and *not* the named Defendant PMC Group N.A. (*See* ECF Nos. 1-4, 1-6, 1-7.) Next, and relatedly, Plaintiff only halfheartedly commits to its claim that a PMC entity *in fact* employs Defendant Favre in its supplemental brief.[17] (ECF No. 17 at PageID 109.) Plaintiff's assumption

---

[16] Had the language instead been "already conducted," this result may have been different.

[17] Time and again, Plaintiff all but explicitly concedes that Defendant Favre works for Aerotek and *not* a PMC entity. For example, Plaintiff writes: "Even if Aerotek is the technical employer of Favre, Aerotek has assigned Favre to work at PMC, and that is **likely** because PMC requested that he be assigned there"; "PMC should not be permitted to hide behind the actions of Aerotek and mere technicalities in its clear attempt to induce the breach . . . while Favre may be an employee of Aerotek, PMC may be a joint employer." (ECF No. 17 at PageID 109–10) (emphasis added). The Court notes a few important observations regarding this argument: first, *nothing* in the record except the Verified Complaint suggests Defendant Favre works for a PMC

14

is a bridge too far. Without more "specific facts" in the Verified Complaint, it is unclear to the Court at this time which entity, of those mentioned or otherwise, *technically* employs Defendant Favre and could be enjoined.[18] *Detroit Will Breathe*, 484 F. Supp. 3d at 515. Therefore, the Court cannot find Plaintiff has a high chance of success on the merits with its tortious interference claim.

### B. Whether Plaintiff Will Suffer Irreparable Harm Absent Injunctive Relief

*1. Applicable Law*

The Sixth Circuit has described the irreparable harm factor as "indispensable" because "if

---

entity; second, Mr. Allen testified to this Court that Defendant Favre does *not* work for PMC Biogenix; third, a TRO that enjoins PMC Group N.A. would be ineffectual if Aerotek is in fact Defendant Favre's employer because the Court cannot, for hopefully obvious reasons, enjoin a nonparty absent a special finding. *In re NAACP, Special Contribution Fund*, 849 F.2d 1473, (6th Cir. 1988) ("a non-party is not bound by an injunction pursuant to Rule 65 until a finding is made in a proceeding in which it is a party that the requisites are indeed present. As no such proceeding occurred here, Rule 65 cannot be used as a vehicle for asserting jurisdiction in the present case."); *see Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 110 (1969); *Regal Knitwear Co. v. NLRB*, 324 U.S. 9 (1945). Should this Court act without clear personal jurisdiction, any judgment or order it renders is void. *See Stoll v. Gottlieb*, 305 U.S. 165, 176 (1938). Moreover, nothing in the record suggests PMC and Aerotek "joint[ly]" employ Defendant Favre. (ECF No. 17 at PageID 109–10.)

[18] Plaintiff's perennial argument that, absent a TRO, PMC Group N.A. would be permitted to "hide behind . . . mere technicalities" is not well taken. (ECF No. 17 at PageID 109.) "Technicalities," so to speak, justify litigants' decisions to hire counsel—they are the bread and butter of the legal profession. While counsel certainly need not pick the proverbial fly poop from the pepper to prevail on the *merits*, *see Foman v. Davis*, 371 U.S. 178, 181 (1962), nuanced questions of law and fact argued with reasonable diligence often drive the analysis and, in many situations, the outcome itself. *Smith v. Holston Med. Group, P.C.*, 595 F. App'x. 474, 480 (6th Cir. 2014) ("failure to exercise reasonable diligence is no mere technicality"). So too here. First, joinder of Defendant Favre's technical employer is essential to ensure that any injunctive relief effectively prohibits any further harm to the movant. Second, although Plaintiff assumes "PMC is in the best position to stop Aerotek from doing engaging [sic] in such behavior because PMC is the entity with the business relationship with Stinson's," the Court remains unclear on: (a) whether Plaintiff refers to PMC Group N.A. or PMC Biogenix, (b) whether PMC Group N.A., that Plaintiff seeks to enjoin, has a relationship with Aerotek at all, and (c) whether the nature of the purported business relationship between whichever PMC entity and Aerotek is one that actually puts PMC Group N.A. in the "best position" to ensure compliance with a Court order. Finally, it seems to the Court that an injunction binding Aerotek would be more effective than one issued to bind either or both PMC entities in hopes that said entity would direct Aerotek to comply. Therefore, the Court soundly rejects Plaintiff's argument on this point.

15

the plaintiff isn't facing imminent and irreparable injury, there's no need to grant relief now as opposed to the end of the lawsuit." *See Sumner Cty. Schs.*, 942 F.3d at 327; *see also Friendship Materials*, 679 F.2d at 102–04. Indeed, "the existence of an irreparable injury is mandatory for a TRO to be issued." *Halferty*, 2022 WL 418692, at *11 (citing *Id.* at 326–27.) "[A] district court is 'well within its province' when it denies a preliminary injunction based solely on the lack of an irreparable injury." *Sumner Cty. Schs.*, 942 F.3d at 327 (citing *S. Milk Sales, Inc. v. Martin*, 924 F.2d 98, 103 (6th Cir. 1991)). "To merit a preliminary injunction, an injury 'must be both certain and immediate,' not 'speculative or theoretical.'" *Id.* at 327 (citing *Griepentrog*, 945 F.2d at 154). "A party seeking an injunction from a federal court must invariably show that it does not have an adequate remedy at law." *N. Cal. Power Agency v. Grace Geothermal Corp.*, 469 U.S. 1306, 1306 (1984) (citing *Hillborough v. Cromwell*, 326 U.S. 620, 622 (1946)). "A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Overstreet*, 305 F.3d at 578. "However, an injury is not fully compensable by money damages if the nature of the plaintiff's loss would make the damages difficult to calculate." *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992) (citing *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984)). Nevertheless, "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough" to show irreparable harm. *Sampson v. Murray*, 415 U.S. 61, 90 (1974).

The Court addresses Plaintiff's breach of contract and tortious interference claims together because the alleged harm derives equally from both claims. Plaintiff alleges that it suffers, and will continue to suffer absent injunctive relief, harm from (a) lost customer goodwill, (b) lost revenue, and (c) potential loss of additional employees. (ECF No. 2-1 at PageID 52–53.) Defendant responds that the record includes no evidence that (a) Defendant poached, or continues

to poach, Plaintiff's employees, (b) Plaintiff suffered economic losses, and (c) Plaintiff refuses to join necessary parties and brought this lawsuit approximately two years after the alleged harm began. (ECF No. 18 at PageID 130.)

Here, the Court accepts that "[t]he loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute." *Basicomputor Corp.*, 973 F.3d at 512. However, Plaintiff has not identified any facts in the record that indicate a loss of customer goodwill. Plaintiff's burden to allege facts that indicate this type of loss is not onerous, and the Sixth Circuit has recognized it can be met where a plaintiff can show "[t]he loss of a product which is unique." *Tri-Cty. Wholesale Distrib., Inc. v. Wine Grp., Inc.*, 565 F. App'x 477, 483 (6th Cir. 2012); *Southern Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 852 (6th Cir. 2017) (loss of customer goodwill where distributor "loses a unique product like Great Lakes' craft beers.")

Applying this standard, Plaintiff has not shown that it provides unique training to its employees that would trigger a loss of customer goodwill under the law it cites.[19] However, even if such a showing had been made, this lawsuit's timing weighs decidedly against a finding of irreparable harm. *First*, Plaintiff, by its own admission, waited over *two years* to seek injunctive relief despite its allegation that it suffered irreparable harm from Defendant's alleged employee-poaching efforts. (ECF No. 1 at PageID 5.) Although, "[a]n unreasonable delay in filing for injunctive relief will weigh against a finding of irreparable harm," *Huron Mountain Club v. U.S. Army Corps of Eng'rs*, 545 F. App'x 390, 397 (6th Cir. 2013) (*quoting Allied Erecting &*

---

[19] Defendant aptly points out that Mr. Moore argues Plaintiff has "too many other opportunities to pursue where Stinson's Industrial is valued for their partnerships." (ECF No. 1-6 at PageID 28; ECF No. 18 at PageID 130.) That Plaintiff claims to have suffered harm since "PMC began its [poaching] efforts . . . approximately two years ago" and yet *still* has "too many opportunities to pursue" proves puzzling and weighs against a finding of irreparable harm. (*Id.*; ECF No. 1 at PageID 5.)

*Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 511 F. App'x 398, 405 (6th Cir. 2013), "[a]ll delays in seeking injunctive relief are not unreasonable" and the reasonableness determination is a "factual determination made by the district court." *York Risk Servs. Grp. v. Couture*, 787 F. App'x 301, 309 (6th Cir. 2019). It is important to remember that Plaintiff seeks a *TRO* in an *emergency* motion. Yet, nothing can explain why the emergency was triggered in April 2022 and not when the alleged poaching scheme commenced two years ago—particularly when the alleged irreparable harm would have started then. The Court finds a two-year delay unreasonable under these circumstances because Plaintiff has (a) not shown any employees that it definitively lost in the past two years to Defendant's alleged poaching efforts,[20] (b) any lost revenue from cutting ties from PMC Biogenix that are not directly attributable to Plaintiff's decision to cut ties with that entity on November 3, 2022, and (c) for reasons unknown has elected not to join Aerotek as a party to this lawsuit despite recognizing it as *the* staffing agency PMC Biogenix uses to hire maintenance employees.[21] (ECF No. 1-6 at PageID 27.) Were the harm in fact as grave as Plaintiff intimates, the Court cannot divine why Plaintiff chose to wait so long to move for a TRO. Therefore, the Court finds that the irreparable harm factor weighs decidedly against Plaintiff as to both claims at this stage in the litigation.

---

[20] Plaintiff expresses fears that it will lose certain employees to Defendant, however it does not provide any reason why these employees, or others like them, have not already left Plaintiff for a PMC entity during the last two years. (ECF No. 2-1 at PageID 53.) The Court has not had the opportunity to review any affidavits from Plaintiff's employees that corroborate the assertion that a PMC entity approached them—a *stark* omission considering Mr. Allen's affidavit provides that PMC Biogenix representatives never approached a Stinson's employee for hire. (ECF No. 18-1 at PageID 136.)

[21] Interestingly, and as a simple *observation* without more, the Court understands from the pleadings that "PMC Biogenix is a separate legal entity, with its principal place of business being 1231 Pope Street in Memphis, Tennessee." (ECF No. 18 at PageID 114.) Thus, if true, joining PMC Biogenix as a party defendant would destroy complete diversity, which would impact this Court's jurisdiction. *See* 28 U.S.C. § 1332(a)(1). Aerotek's citizenship remains unknown at this time and could, at least conceivably, present a similar issue.

### C. Whether a TRO Causes Substantial Harm to Others and Serves the Public Interest

Under the circumstances of this case, these two factors weigh the least in the Court's analysis because the first two factors preclude injunctive relief on their own. *See Halferty*, 2022 WL 418692, at *11 ("the existence of an irreparable injury is mandatory for a TRO to be issued.") Nevertheless, it is worth noting that injunctive relief in this instance could harm third parties not yet joined to this lawsuit, namely Aerotek and PMC Biogenix, because they would be compelled to comply with an order that never contemplated their interests (if any) at all; the Court will not speculate about what their interests might be (or assume they are uninterested). Finally, the public interest would not be served should the Court decide to enjoin the activities of nonparties and, contrary to Tennessee law, enforce the "spirit" — rather than the *letter* — of the Noncompete Agreement, particularly when such agreements are generally disfavored in Tennessee. *See Columbus Med. Servs.*, 308 S.W.3d at 384; *Great Am. Opportunities, Inc. v. Cherry Bros., LLC*, No. 3:17-cv-1022, 2018 WL 418567, at *18 (M.D. Tenn. 2018) (quoting *Murfreesboro Med. Clinic, P.A.*, 166 S.W.3d at 678) ("In general, covenants not to compete are disfavored in Tennessee.") Therefore, without more, the Court concludes that preliminary injunctive relief in this matter is inappropriate.

### **CONCLUSION**

For the foregoing reasons, and having fully considered the applicable discretionary factors and governing law, the Court declines to issue the preliminary injunctive relief requested. Therefore, Plaintiff's Motion is **DENIED**. (ECF No. 2.)

**IT IS SO ORDERED** this 12th day of May, 2022.

*s/ Mark Norris*
MARK S. NORRIS
UNITED STATES DISTRICT JUDGE